UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| POLLY KINTER, | CASE NO. 5:12CV490 |
| Plaintiff, | JUDGE PATRICIA A. GAUGHAN |
| v. | Magistrate Judge George J. Limbert |
| CAROLYN W. COLVIN[1], ACTING COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE** |
| Defendant. | |

Polly Kinter ("Plaintiff") seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Commissioner of the Social Security Administration ("SSA"), denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). ECF Dkt. #1. For the following reasons, the undersigned recommends that the Court REVERSE the Administrative Law Judge's ("ALJ") decision and REMAND the decision for reevaluation and further analysis of whether Plaintiff has any nonexertional limitations and therefore whether direct application of the Medical-Vocational Guidelines is proper.

**I.     PROCEDURAL AND FACTUAL HISTORY**

On January 14, 2008, Plaintiff applied for DIB and SSI alleging disability beginning January 7, 2008 due to a heart attack. ECF Dkt. #12 at 94- 104.[2] The SSA denied Plaintiff's application initially and on reconsideration. *Id*. at 69-80. Plaintiff requested an administrative hearing before an ALJ, and on May 26, 2010, an ALJ conducted a hearing and accepted the

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

[2]References to the administrative record in this case refer to the ECF docket number of the cited document and the page number assigned to cited pleading by the ECF system, which can be found in the search box at the top of the page on the ECF toolbar.

testimony of Plaintiff, who was represented by counsel, and a vocational expert ("VE"). *Id*. at 38, 81-82. On September 20, 2010, the ALJ issued an unfavorable decision and Plaintiff filed a request for review of that decision, which was denied by the Appeals Council on January 20, 2012. *Id*. at 1-21.

On February 29, 2012, Plaintiff filed the instant suit seeking review of the ALJ's decision. ECF Dkt. #1. On August 10, 2012, Plaintiff filed a brief on the merits. ECF Dkt. #14. On October 5, 2012, Defendant filed a brief on the merits. ECF Dkt. #16. Plaintiff filed a reply brief on October 15, 2012. ECF Dkt. #17.

## II.     RELEVANT MEDICAL HISTORY

On January 7, 2008, Plaintiff presented to the emergency room complaining of several days of shoulder pain, with chest pressure and associated nausea, vomiting, diaphoreses and dry heaves. ECF Dkt. #12 at 172. Upon arrival, Plaintiff was noted to be bradycardic. *Id*. She was transferred to the cardiac catherization lab, diagnosed with a principle diagnosis of ST elevation inferior myocardial infarction and a secondary diagnosis of coronary artery disease and tobacco abuse. *Id.* at 181. Two stents were applied to her right coronary artery and she was discharged from the hospital on January 9, 2008. *Id.* She was advised to quit smoking and start a cardiac diet and was restricted from lifting, pushing or pulling more than five pounds for the following five days. *Id.* at 183. Plaintiff was also advised to attend cardiac rehabilitation. *Id*.

On February 27, 2008, Plaintiff presented for follow-up with Dr. Newton, who indicated that Plaintiff had presented to the office on an earlier date for follow-up and a submaximal stress test, but she was unable to perform the stress test due to an upper respiratory infection, and thus was not going to cardiac rehabilitation. ECF Dkt. #12 at 236. Upon examination and normal EKG results, Dr. Newton found that Plaintiff was asymptomatic from a coronary standpoint and he recommended that she take the stress test and initiate cardiac rehabilitation. *Id.* at 237. He noted that Plaintiff had initially stopped smoking with the help of medication, but then stopped the medication and resumed smoking. *Id*. Dr. Newton strongly encouraged Plaintiff to stop using tobacco and he reinitiated the medication. *Id*. In a later treatment note, Plaintiff had

-2-

explained that she stopped taking the medication because it made her feel very depressed. *Id*. at 286. Dr. Newton ordered a repeat EKG after Plaintiff completed cardiac rehabilitation and recommended that Plaintiff return to his office in one year. *Id*. at 261.

On March 11, 2008, Plaintiff had a treadmill stress test and conclusions from the test indicated that Plaintiff had slightly below average fitness levels for her age, an abnormal chronotropic response to activity due to medical therapy, normal blood pressure response with exercise, asymptomatic treadmill test for angina, and an abnormal stress electrocardiogram with ST depression suspicious for ischemia, with no arrhythmias seen. ECF Dkt. #12 at 269.

On March 15, 2008, Plaintiff presented to the emergency room complaining of chest pain and left-sided arm pain, with intermittent shortness of breath and diaphoresis. ECF Dkt. #12 at 211. Plaintiff indicated that up until this time, she had experienced no problems since her heart catherization and stenting in January 2008. *Id.* She indicated that she smoked two to three cigarettes per day. *Id*. at 216. A chest x-ray and cardiac enzymes showed normal results, but her EKG showed that she had sinus bradycardia. *Id*. at 215. She was admitted to the coronary care unit of the hospital and given nitroglycerin, oxygen therapy, aspirin and she was placed on IV nitroglycerin and given Lovenox for system anticoagulation therapy. *Id*. at 214. The doctor's impression was that Plaintiff had chest pain secondary to symptomatic bradycardia and to medication reaction to her beta blockers. *Id.* at 225. The doctor reduced Plaintiff's beta blockers and advised Plaintiff to quit smoking immediately. *Id.* at 215, 225.

On June 23, 2008, Plaintiff underwent an echocardiogram which showed normal mitral, aortic and tricuspid valves, normal right ventricle, right atrium and pericardium, with low normal left ventricular systolic function, and a mildly dilated left atrium. ECF Dkt. #12 at 271. Conclusions from this test included a segmental left ventricular dysfunction and left atrial enlargement. *Id.*

On June 25, 2008, Plaintiff reported at a follow-up visit that she was experiencing a heavy sensation feeling and achiness in her shoulders only when she laid down to rest. ECF Dkt. #12 at 286. An EKG showed an old interior infarct with some nonspecific T-wave inversion in

V4 through V6. *Id.* at 287. It was noted that Plaintiff had one more week of cardiac rehabilitation to complete and her prescription to help her quit smoking was discontinued as she had already stopped taking it due to side effects. *Id*. It was further noted that Plaintiff indicated that she wanted to quit smoking but felt that she could not do it on her own. *Id*. Plaintiff asked to try a different medication and she was prescribed another one. *Id.*

On August 22, 2008, Dr. Torello, an agency consulting physician, completed a physical RFC assessment, listing Plaintiff's primary diagnosis as status post myocardial infarction in January 2008 and her secondary diagnosis as status post bradycardia in March 2008. ECF Dkt. #12 at 288. Dr. Torello opined that Plaintiff could lift and carry objects weighing up to fifty pounds occasionally and up to twenty-five pounds frequently. *Id.* at 289. She also opined that Plaintiff could sit, stand and/or walk for a total of about six hours of an eight-hour workday and Plaintiff had the unlimited ability to push and/or pull objects. *Id*. Dr. Torello further limited Plaintiff to only occasional climbing of ramps, stairs, ladders, ropes and scaffolds and to avoiding concentrated exposure to extreme cold and heat and to humidity. *Id*. at 290, 293.

September 5, 2008 treatment notes from Dr. Ghumrawi show that Plaintiff underwent a carotid ultrasound due to her complaints of dizziness. ECF Dkt. #12 at 300. The ultrasound revealed mild atherosclerotic disease in the right internal carotid artery showing no significant stenosis and atherosclerotic plaques of the left internal carotid artery which showed severe stenosis of 70% or greater. *Id.* Upon physical examination, Dr. Ghunrawi noted that Plaintiff's neck showed a left carotid bruit. *Id.* at 303. On September 30, 2008, Plaintiff underwent a left carotid endarterectomy with bovine patch surgery in order to remove the plaque buildup. *Id*. at 307. Plaintiff was discharged the following day. *Id.*

On November 2, 2008, Plaintiff presented to the emergency room complaining of left-sided neck spasm and left shoulder pain with intermittent shortness of breath and nausea. ECF Dkt. #12 at 318. An EKG showed normal sinus rhythm and no acute ischemia or injury pattern and cardiac enzymes and a chest x-ray were normal, but Plaintiff was kept overnight to rule out acute coronary syndrome. *Id.* at 320, 322. Plaintiff underwent a cardiac stress test which

concluded an abnormal submaximal graded exercise secondary to chest pain and EKG changes and hypertensive blood pressure response to exercise. *Id*. at 323. The accompanying myocardial perfusion imaging was abnormal and showed a large inferior wall scar and small anterior wall ischemia, with mild left ventricle systolic dysfunction. *Id.* at 324.

On November 5, 2008, Plaintiff underwent a left heart catherization, and left ventriculography and coronary arteriography. ECF Dkt. #12 at 327. Dr. Tsai, the cardiologist performing the procedure, noted his impression as "severe, progressive atherosclerotic heart disease with occluded stents to the right coronary artery and collateralization from the left coronary system. In addition, there is significant obstructive narrowing in the ostium of the left main trunk as well as moderate disease in the proximal third of the left anterior descending." *Id.* at 329. Dr. Tsai commented that Plaintiff was a candidate for coronary revascularization surgery with grafts to the left anterior descending and distal right coronary artery. *Id*. She was transferred to another hospital for definitive management. *Id.* at 337. Discharge diagnoses included left main stenosis with 100% occlusion of a stented right coronary artery, peripheral vascular disease, hypertension, dyslipidemia and tobacco abuse. *Id*. at 337.

On November 13, 2008, Plaintiff was admitted to the hospital in order to undergo coronary bypass grafting. ECF Dkt. #12 at 350. Dr. Laden performed the procedure and Plaintiff was discharged from the hospital on November 19, 2008 with final diagnoses of coronary artery disease, peripheral vascular disease, history of myocardial infarction in 2008, hypertension, dyslipidemia and tobacco abuse. *Id*. at 359.

On December 16, 2008, Plaintiff presented to Dr. Laden for follow up and she had no complaints. ECF Dkt. #12 at 480. Dr. Laden noted that Plaintiff continued to smoke. *Id.*

On March 15, 2009, Plaintiff presented to her cardiologist Dr. Newton for follow up of her conditions. ECF Dkt. #12 at 408. Plaintiff complained of excessive snoring and waking herself up from sleep due to snoring and intermittent atypical sharp chest pain with movement. *Id*. Dr. Newton emphasized that *"despite all her cardiac and peripheral ailments, the patient continues to smoke but has cut down*." *Id.* [emphasis in original]. Dr. Newton noted an

-5-

unremarkable physical examination and found Plaintiff "[c]ompletely asymptomatic from a cardiac standpoint." *Id.* at 408-409.  He ordered a stress test to be followed by cardiac rehabilitation and he ordered a sleep study.  *Id.* at 409.  He also strongly encouraged Plaintiff to stop smoking and gave her a prescription aid.  *Id.*

Plaintiff presented to her primary care physician Dr. Kara on March 16, 2009 complaining of shoulder pain.  ECF Dkt. #12 at 433.  His diagnoses included tendinitis, postherpetic neuralgia, hypertension, and carotid artery narrowing.  *Id*. at 434.

On March 24, 2009, Plaintiff underwent a routine stress test which showed an abnormal graded test secondary to EKG changes not associated with chest pain.  ECF Dkt. #12 at 389.  There was also a blunted chronotropic reponse and average exercise capacity.  *Id*.

On April 9, 2009, Plaintiff underwent a carotid ultrasound which showed mild athersclerotic disease in the right and left internal carotid arteries with no significant stenosis.  ECF Dkt. #12 at 392.

On March 31, 2009 and April 15, 2009, Plaintiff underwent overnight polysomnogram/nasal CPAP titration studies at the sleep disorder center of the hospital which resulted in the diagnosis of obstructive sleep apnea with hypersomnia.  ECF Dkt. #12 at 395-398.

On April 9, 2009, Dr. Ghumrawi ordered a carotid ultrasound which showed that Plaintiff had mild atherosclerotic disease in the right and left internal carotid arteries showing no significant stenosis.  ECF Dkt. #12 at 432.

On May 15, 2009, Dr. Kara, Plaintiff's primary care physician, completed a RFC form in which he opined that Plaintiff could lift and carry up to five pounds only occasionally, she could stand and/or walk only one hour out of an eight-hour workday with interruption of that one hour, and she could sit without limitation.  ECF Dkt. #12 at 424.  He further concluded that Plaintiff could never climb, balance, stoop or crawl, and could occasionally crouch and kneel.  *Id*. at 425.  Dr. Kara opined that Plaintiff's abilities to reach, handle and push/pull were affected by her impairments, and she had the environmental restrictions to heights, moving machinery, exposure to temperature extremes, dust, fumes, humidity and vibration.  *Id.*  As support for his conclusions, Dr. Kara noted that Plaintiff had moderate/severe coronary artery disease, a history

of myocardial infarction, and bypass surgery.  *Id.* at 424.  He also included his medical records.  *Id.* at 426-454.

An August 4, 2009 treatment note from Dr. Kara indicated that Plaintiff presented complaining of experiencing moderate left shoulder pain for the past six months.  ECF Dkt. #12 at 471.

On September 22, 2009, Plaintiff presented to Dr. White complaining that she could not sleep with the CPAP machine that she was using.  ECF Dkt. #12 at 460.  She indicated that she had only used the machine three or four times since it was prescribed because she could not sleep with it running.  *Id.*  Dr. White diagnosed her with obstructive sleep apnea and noted Plaintiff's inability to tolerate the therapy and her tobacco addiction, coronary artery disease, status post myocardial infarction bypass surgery and cardiac stents, peripheral vascular disease and hypercholesterolemia.  *Id.*  Dr. White had a long discussion with Plaintiff regarding her continued use of tobacco and advice regarding using the CPAP machine and the complications if she did not wear it.  *Id.*

On November 10, 2009, Plaintiff underwent a carotid ultrasound which showed mild atherosclerotic disease in the right and left internal carotid arteries with no significant stenosis.  ECF Dkt. #12 at 462.

On May 15, 2010, Plaintiff presented to the emergency room complaining of awakening at 3:00 a.m. with pain in her left shoulder that waxed and waned throughout the morning.  ECF Dkt. #12 at 500.  She indicated that it was a sharp pain that had gotten worse and baby aspirin did not help.  *Id*.  She noted nausea and weakness, but no chest pain.  *Id*.  She thought that the pain she was experiencing was similar to that preceding her myocardial infarction in 2008.  *Id*.  The physical examination and cardiac enzymes were normal, but the EKG indicated chest pain and an x-ray showed cardiomegaly.  *Id*. at 501, 504.

**III**. **SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

In his September 20, 2012 decision, the ALJ determined that Plaintiff, who was forty-nine years old on the date of the hearing, suffered from coronary artery disease, peripheral vascular disease, obstructive sleep apnea, and high blood pressure, which qualified as severe

-7-

impairments under 20 C.F.R. §§ 404.1520(c) and 416.920(c).  ECF Dkt.#12 at 17-20.  The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§404.1520(d), 416.920(d), 416.925 and 416.926 ("Listings").  *Id*. at 17-18.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform a full range of sedentary work and could not perform her past relevant work, but could perform jobs existing in significant numbers in the national economy based upon application of the Medical-Vocational Guidelines, specifically Medical-Vocational Rule 201.21.  ECF Dkt. #12 at 21.  As a consequence, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and was not entitled to benefits.  *Id.*

## IV. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits.  These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see  20 C.F.R.  § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## V. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). An ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted). When substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon which the ALJ could have found plaintiff disabled. *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir.2001). Thus, the ALJ has a " 'zone of choice' within which he can act without the fear of court interference." *Id.* at 773.

## VI. LAW AND ANALYSIS

### A. CREDIBILITY ANALYSIS

Plaintiff first asserts that the ALJ failed to properly evaluate her credibility regarding the intensity, persistence and limiting effects of her symptoms. ECF Dkt. #14 at 7-12. Plaintiff reviews the ALJ's reasons for discounting her credibility and provides analysis purporting to

-9-

show that inconsistencies did not exist between her complaints of pain and limitation and his reasons for discounting her credibility. *Id.*

An ALJ may discount a claimant's credibility where he finds contradictions among the medical records, claimant's testimony, and other evidence. *Walter v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997). "It [i]s for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir.2001), quoting *Myers v. Richardson*, 471 F.2d 1265, 1267 (6th Cir.1972). Nevertheless, an ALJ's credibility determinations regarding subjective complaints must be reasonable and supported by substantial evidence. *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 249 (6th Cir. 2007).

The social security regulations establish a two-step process for evaluating pain. *See* 20 C.F.R. §§ 404.1529, 416.929. In order for pain or other subjective complaints to be considered disabling, there must be (1) objective medical evidence of an underlying medical condition, and (2) objective medical evidence that confirms the severity of the alleged disabling pain arising from that condition, or objectively, the medical condition is of such severity that it can reasonably be expected to produce such disabling pain. *Id.; Stanley v. Sec'y of Health and Human Servs.*, 39 F.3d 115, 117 (6th Cir.1994); *Felisky v. Bowen*, 35 F.3d 1027, 1038–1039 (6th Cir.1994); *Duncan v. Sec'y of Health and Human Servs.*, 801 F.2d 847, 853 (6th Cir.1986). Therefore, the ALJ must first consider whether an underlying medically determinable physical or mental impairment exists that could reasonably be expected to produce the individual's pain or other symptoms. *See id.* Secondly, after an underlying physical or mental impairment is found to exist that could reasonably be expected to produce the claimant's pain or symptoms, the ALJ then determines the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit the claimant's ability to do basic work activities. *See id.*

When a disability determination that would be fully favorable to the plaintiff cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the plaintiff, considering the plaintiff's statements about pain or other symptoms with the rest

-10-

of the relevant evidence in the record and factors outlined in Social Security Ruling 96–7p. *See* SSR 96–7p, 61 Fed.Reg. 34483, 34484–34485 (1990). These factors include: the claimant's daily activities; the location, duration, frequency and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any pain medication; any treatment, other than medication, that the claimant receives or has received to relieve the pain; and the opinions and statements of the claimant's doctors. *Felisky*, 35 F.3d at 1039–40. Since the ALJ has the opportunity to observe the claimant in person, a court reviewing the ALJ's conclusion about the claimant's credibility as to pain should accord great deference to that determination. *See Casey v. Sec'y of Health and Human Servs*., 987 F.2d 1230, 1234 (6th Cir.1993). Nevertheless, an ALJ's assessment of a claimant's credibility as to pain must be supported by substantial evidence. *Walters*, 127 F.3d at 531.

The ALJ in this case discounted Plaintiff's complaints of pain and limiting effects based upon the objective medical evidence, Plaintiff's failure to comply with treatment recommendations and her attempts to seek work, her daily living activities that allegedly contradicted her complaints of pain and limitations, and his rejection of portions of the RFC of her treating physician and the state agency consulting physician.  Keeping in mind the standard of review and that even if substantial evidence exists to the contrary, this Court cannot reverse the ALJ's decision if it is based on substantial evidence, the undersigned recommends that the Court find that despite some errors, substantial evidence nevertheless supports the ALJ's credibility determination.

As to the objective medical evidence, the ALJ  noted Plaintiff's 2008 heart attack that required catherization and the placement of two stents, and her coronary artery double bypass grafting in November of 2008.  ECF Dkt. #12 at 22.  However, he further cited to a July 2009 lower extremities test showing no evidence of significant arterial occlusive disease and a November 2009 test showing that Plaintiff had only mild atherosclerotic disease with no significant stenosis.  ECF Dkt. #12 at 23.  He also cited to Dr. Newton's March 18, 2009 statement that Plaintiff was "completely asymptomatic from a cardiac standpoint."  *Id*.  He

-11-

further noted Dr. Iler's conclusion after a stress test that Plaintiff had "average exercise capacity" and his note that Plaintiff had normal left ventricular function in May of 2010. *Id*. at 24.

Plaintiff complains that the ALJ "played doctor" by drawing a conclusion from Dr. Ghumrawi's medical records that Plaintiff's symptoms were not as limiting as she testified. ECF Dkt. #14 at 565-566. The ALJ had cited to Dr. Ghumrawi's records showing that after he performed a left carotid endarterectomy with a bovine patch on Plaintiff in September of 2008, tests in November 2009 showed that Plaintiff had only mild atherosclerotic disease in her right and left carotid arteries with no significant stenosis. ECF Dkt. #12 at 68. Plaintiff asserts that the doctor's records do not indicate the effect that a reduction in plaque buildup on Plaintiff's carotid artery would have on her symptoms and the ALJ "played doctor" by finding that the plaque reduction lessened or improved her symptoms, making them inconsistent with complaints of pain and limitations. ECF Dkt. #14 at 8-9. However, the undersigned recommends that the Court find that the ALJ did not "play doctor" in concluding that Plaintiff's symptoms were not as limiting as she testified because he relied upon other evidence, both medical and nonmedical, to support this finding. The ALJ cited to Dr. Newton's findings that Plaintiff "was asymptomatic from a coronary standpoint," which Dr. Newton found both in February of 2008 and again in March of 2009. ECF Dkt. #12 at 23, 261, 409.

The ALJ also cited to Plaintiff's failure to follow treatment recommendations, including smoking cessation, wearing a CPAP machine, and attending cardiac rehabilitation. ECF Dkt. #12 at 23-24. These findings are correct as the records show that while Plaintiff did attempt to stop smoking with the aid of a prescription medication, she stopped taking the medication due to its side effects, and despite being prescribed another medication, she continued to smoke, even though doctors warned her repeatedly to stop. ECF Dkt. #12 at 318, 408, 460, 480, 500. She also failed to use the CPAP machine as advised by Dr. White, informing him that she could not sleep with it running. *Id.* at 460. However, Dr. White noted that he had a long discussion with Plaintiff about the importance of using the machine and the complications if she did not wear it. *Id.* It also appears that while Plaintiff complied with the first round of cardiac rehabilitation

-12-

ordered by her doctor, she had scheduling difficulties for the second round ordered in March of 2009 and only attended one time. *Id.* at 400.

Plaintiff asserts that the Court should remand this case pursuant to SSR 82-59 because the ALJ failed to inquire into her reasons for not complying with the treatment recommendations. ECF Dkt. #14 at 11-12, n. 2. SSR 82-59 provides that if a claimant fails to follow prescribed medical treatment and that treatment is expected to restore the claimant's ability to engage in substantial gainful activity, a claimant must be given notice of the issue and an opportunity to show justifiable cause for noncompliance before a disability determination is made. SSR 82-59. However, courts in this Circuit have found this Ruling inapplicable in cases where the ALJ has considered the noncompliance as only one factor is assessing a claimant's credibility or in cases where no prior disability ruling was made by an ALJ that was thereafter undone by a claimant's noncompliance with treatment recommendations. *See Carr v. Colvin,* No. 3:11-0805, 2013 WL 1309094, at *24 (M.D. Tenn., March 12, 2013)("[h]ad the ALJ limited his discussion of the plaintiff's noncompliance to the issue of credibility, he would not have committed error."); *Bozarth v. Astrue,* No. 2013 WL 456483, at *15 (M.D. Tenn., Feb. 2013)("[a] precondition to the applicability of SSR 82-59 is that the ALJ determine that the plaintiff was disabled. The ALJ did not determine that the plaintiff was disabled. Therefore, SSR 82-59 is inapposite to the facts of this case."); *Kays v. Astrue,* No. 4:12CV161, 2013 WL 504158, at *12 (N.D. Ohio, Jan. 16, 2013)(SSR 82-59 inapplicable where there was no prior ALJ finding that claimant was disabled but would not have been disabled had he followed treatment recommendations), report and recommendation adopted by 2013 WL 489684 (N.D. Ohio, Feb. 8, 2013); *Milligan v. Astrue,* No. 1:10CV126, 2011 WL 1579206, at *5 (N.D. Ohio, Apr. 26, 2011), unpublished (ALJ erred in not following SSR 82-59 when ALJ based finding that claimant did not meet or equal listing on claimant's noncompliance with treatment). In the instant case, the ALJ did not make a prior determination of disability and he used Plaintiff's noncompliance with treatment recommendations only as one factor in determining her credibility. Accordingly, the undersigned recommends that the Court find that SSR 82-59 is not applicable in this case and the record provides substantial evidence to support the ALJ's finding that Plaintiff failed to comply

with treatment recommendations to stop smoking, use the CPAP machine as directed, and to attend cardiac rehabilitation.

The ALJ also relied upon a statement by Plaintiff to the agency in May of 2008 that she attempted to return to work but was told by her employer that no work was available.  ECF Dkt. #12 at 23.  Plaintiff asserts that the ALJ misinterpreted this statement in his decision even though she clarified at the ALJ hearing that while she did attempt to get her job back when she recovered from her January 2008 heart attack, her employer informed her that they had nothing for her "because I couldn't perform the job anymore."  ECF Dkt. #12 at 53.  Plaintiff is correct that the ALJ erred in using this report to discount her credibility after she explained the statement at the hearing.  However, this was only one factor that the ALJ mentioned in his credibility analysis and it does not appear that he placed great weight on it.  He placed this statement at the end of his  analysis of the objective medical evidence and after indicating that Plaintiff's doctor had released her to return to work.  *Id*. at 23.  Thus, the undersigned thus recommends that the Court find that it is not reversible error.

The ALJ additionally noted Plaintiff's testimony that she had applied for waitress and cashier jobs, which he concluded was inconsistent with her allegations of pain and limiting effects from her impairments.  ECF Dkt. #12 at 24.  Plaintiff did testify at the hearing that she had applied for other jobs, including waitress and cashier jobs.  *Id.* at 54.  However, she also stated that after she applied for those jobs, she had to undergo additional surgeries and thus was unable to go back to work at all.  *Id*.  Plaintiff also takes issue with the ALJ's use of this statement in discounting her credibility, asserting that the ALJ left out her testimony explaining that she had applied for these jobs before she had to undergo additional surgeries and she could not perform them now.  Again, while the ALJ did err in using this information without Plaintiff's explanation at the hearing, it was only one minor fact that he recited to support his credibility determination.  Thus, the Court should find that it is not reversible error.

The ALJ also looked at Plaintiff's daily living activities and found them inconsistent with her allegations of pain and limiting effects.  ECF Dtk. #12 at 22-24.  He found that her statements that she could walk for thirty minutes, walk 1.5 blocks daily, help with laundry and

-14-

cooking, and take short trips to the grocery store or to the library with her grandchildren were inconsistent with her alleged limitations and with her treating physician's RFC assessment limiting her to only one hour of standing or walking during an eight-hour period.  ECF Dkt. #12 at 24.  Plaintiff does not challenge this part of the ALJ's credibility analysis in her brief.

Since the two errors committed by the ALJ in his credibility analysis were minor, and the rest of his analysis was supported by substantial evidence, the undersigned recommends that the Court find no merit to Plaintiff's assertion that the ALJ's credibility analysis was unsupported or inadequate.

### B.  NONEXERTIONAL LIMITATIONS

Plaintiff also asserts that the ALJ misapplied the Medical-Vocational Guidelines to her case because he failed to consider the nonexertional limitations that both her treating physician and the agency consulting physician opined that she had.  ECF Dkt. #14 at 14-16.  For the following reasons, the undersigned recommends that the Court agree and remand this case for the ALJ to reevaluate and analyze whether Plaintiff has nonexertional limitations and explain his or conclusion as to whether Plaintiff has nonexertional limitations.

At the fifth step of the disability analysis, the Commissioner has the burden of showing that a significant number of jobs exist in the economy that a claimant can perform with her RFC and vocational profile.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).  The Commissioner meets that burden by referring to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, App'x 2 ("Grids"), which dictate a finding of "disabled" or "not disabled" based on the claimant's exertional restrictions, age, education, and prior work experience. *See Born v. Secretary of Health & Human Servs.*, 923 F.2d 1168, 1173 (6th Cir.1990).  The Grids are found in the regulations and are a shortcut to eliminate the need for calling a vocational expert. *Hurt v. Secretary of Health and Human Servs.*, 816 F.2d 1141 (6th Cir.1987).

However, if a claimant has both exertional and nonexertional impairments, the ALJ is not permitted to rely on the Grids alone to determine whether a disability exists.  20 C.F.R. pt. 404, subpt. P, app. 2, §200.00(e).  "[B]efore reaching the conclusion that the grid will not be applied because [of the alleged] nonexertional limitations, those limitations must be severe enough to

restrict a full range of gainful employment at the designated level." *Collins v. Comm'r of Soc. Sec.,* No. 08-6473, 357 Fed. App'x 663 , 2009 WL 4906907, at **7, (6th Cir. Dec. 18, 2009), unpublished, quoting *Mullins v. Sec'y of Health & Hum. Servs.*, 836 F.2d 980, 985 (6th Cir.1987). If a claimant's nonexertional limitations prevent him or her from doing the full range of work at the designated level, then the ALJ must come forward with some reliable evidence showing that there remains a significant number of jobs that the claimant can perform, taking into account the claimant's exertional and nonexertional limitations. *See Shelman v. Heckler*, 821 F.2d 316, 321-22 (6th Cir.1987). The ALJ may rely on the assistance of a vocational expert to make this determination. *See Damron v. Sec'y of Health & Hum. Servs.*, 778 F.2d 279, 282 (6th Cir.1985).

In his decision in the instant case, the ALJ addressed the RFC assessment of Dr. Kara, Plaintiff's treating physician, who opined that Plaintiff could lift five pounds occasionally, stand/walk up to one hour in an eight-hour day, sit for unlimited periods, and could never climb, balance, stoop or crawl, only occasionally crouch and kneel, and had limitations in reaching, handling, and pushing and pulling objects. ECF Dkt. #12 at 23, 424. Dr. Kara also opined that Plaintiff had environmental restrictions related to heights, moving machinery, temperature extremes, dust, fumes, humidity and vibration. *Id*. at 425. In addressing this assessment, the ALJ found that "Dr. Kara's opinion is mainly consistent with a residual functional capacity for sedentary work. Moreover, the undersigned does not accept the conclusion of no more than one hour of standing and walking in an 8 hour day, as it is not well supported." *Id.* The ALJ went on to explain why this limitation was not supported. However, he did not go on to address any of the nonexertional limitations opined by treating physician Dr. Kara and why he apparently rejected them.

The ALJ also considered the state agency consulting physician's RFC assessment, noting that she had found that Plaintiff had a medium work RFC. ECF Dkt. #12 at 24. He afforded this assessment less than full weight because the physician, Dr. Torello, did not treat Plaintiff or review other source statements regarding Plaintiff's RFC. *Id*. Dr. Torello had opined that Plaintiff could perform medium work, but she found nonexertional limitations of only occasional climbing or ramps and stairs and never climbing ladders, ropes and scaffolds, as well as the

-16-

environmental limitations of avoiding concentrated exposure to extreme cold, extreme h eat and humidity.  *Id.* at 290, 292.  While he found that Plaintiff's daily living activities suggested a higher exertion capacity than sedentary work, he gave her "every possible benefit of any doubt," and found that she could perform sedentary work.  *Id.*  He did not address any of the nonexertional limitations opined by Dr. Torello.

While Defendant provides reasons for the ALJ to reject the assessment opinions of Drs. Kara and Torello, the ALJ did not provide such reasons in his decision.  He provided no explanation as to his rejection of the nonexertional limitations.  Accordingly, the undersigned recommends that the Court not accept such post-hoc rationalizations justifying the ALJ's determination.  This Court must rely upon the actual analysis in an ALJ's opinion and not post-hoc arguments made by Defendant.  *See Fleischer v. Astrue*, 774 F.Supp.2d 875, 882 (N.D. Ohio 2011).  Moreover, the ALJ accepted Dr. Kara's RFC opinion, except for the standing/walking limitation, as consistent with his RFC, but he failed to incorporate the nonexertional limitations or otherwise explain why he did not incorporate those limitations.  In addition, the undersigned notes that the ALJ had a VE at the hearing, but only asked her about the exertional levels of Plaintiff's prior employment and whether she had any skills that were transferable to a sedentary work level.  ECF Dkt. #12 at 55.  He did not ask the VE about a hypothetical individual with nonexertional limitations.

In the conclusion portion of the RFC analysis in his decision, the ALJ merely stated:

> In sum, the above residual functional capacity assessment is supported by the objective medical evidence, diagnostic testing, and the claimant's activities of daily living.  This evidence supports the finding that the claimant would be capable of at least sedentary work with no additional limitations.

ECF Dkt. #12 at 24.  He fails to explain why he found no nonexertional limitations.  In the fifth step of his analysis, the ALJ cited to the regulations defining the Grids and noted that they can be used as only a framework when a claimant cannot perform substantially all of the exertional demands of work at a given level or when she has nonexertional limitations in addition to exertional limitations.  *Id*. at 25.  The ALJ concluded that "[b]ased upon a residual functional capacity for the full range of sedentary work, considering the claimant's age, education, and

-17-

work experience, a finding of 'not disabled' is directed by Medical-Vocational Rule 201.21." *Id.*

Since it is clear that the ALJ failed to explain why he rejected the nonexertional limitations opined by Dr. Kara and Dr. Torello, the undersigned recommends that the Court REMAND this case for further evaluation, analysis and explanation concerning the nonexertional limitations, if any, that Plaintiff has.  Upon remand, if the ALJ again finds that Plaintiff has no nonexertional impairments, he must explain why he found none to exist despite physician opinions, including a treating physician's opinion, finding to the contrary.  If the ALJ finds that Plaintiff does have nonexertional impairments, the ALJ must either explain how those limitations are not severe enough to restrict a full range of gainful employment at the designated level or he or she must proceed to use the Grids as only a framework and obtain a VE to testify at the hearing.

### C.     USE OF AGE CATEGORY IN THE GRIDS

Plaintiff also asserts that the ALJ misapplied the Grids at Step Five of the disability analysis because he failed to consider whether he should consider using an older-age category for Plaintiff because on the date of her hearing, Plaintiff was four months away from her fiftieth birthday and she turned fifty years old on the date that the ALJ's decision was rendered.  ECF Dkt. #14 at 12.  Plaintiff contends that in such a "borderline" age situation, the ALJ must explicitly articulate his reasoning for using the higher age range or the claimant's chronological age.  *Id.* at 13.

The undersigned recommends that the Court not address this assertion of error since the undersigned has already recommended remand of the case for the ALJ to reevaluate, analyze and further explain his determination of any nonexertional limitations that Plaintiff may have and such a determination will impact whether the ALJ can use the Grids directly as he did in this case.

### VII.   CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the Court REVERSE the ALJ's decision and REMAND the decision for reevaluation and further analysis of whether

-18-

Plaintiff has any nonexertional impairments and whether direct application of the Grids is proper.

DATE: April 18, 2013

           */s/George J. Limbert*
           GEORGE J. LIMBERT
           UNITED STATES MAGISTRATE JUDGE

  ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice.  Fed. R. Civ. P. 72; L.R. 72.3.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).